1

2

3

4

5

6

7

8                                        **UNITED STATES DISTRICT COURT**

9                                        **EASTERN DISTRICT OF CALIFORNIA**

10

11    J.S.H.M,                                        Case No. 1:25-CV-01309 JLT SKO

12                        Petitioner,                  ORDER GRANTING PRELIMINARY
                                                       INJUNCTION IN PART[1]
13    v.
                                                       (Doc. 2)
14    MINGA WOFFORD, et al.,

15                        Respondents.

16    **I.      INTRODUCTION**

17              J.S.H.M, a 28-year-old native of Colombia, crossed the border into the United States on

18    April 5, 2022. (Doc. 13 at 4.) At the time of his entry, he entered the country as a "family unit" in

19    which he identified the woman and child with whom he entered as his wife and child. (*Id*. at 4,

20    11.) He was initially detained in a border holding facility for a few days in Yuma, Arizona, but

21    was released on April 6, 2022, "due to detention capacity" at that facility. (*Id*. at 6.) The record

22    indicates that DHS paroled him pursuant to INA 212(d)(5) [8 U.S.C. § 1182(d)(5)], which allows

23    for discretionary parole into the United States "under such conditions as [DHS] may prescribe

24    only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." (*Id*. at

25    11.) J.S.H.M. was required to comply with the terms of the Alternatives to Detention (ATD)

26    ───────────────

27    [1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for
      preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not
      required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief
28    granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for
      Preliminary Injunction.

program "as a condition of Parole." (*Id*. at 6.) The ATD enrollment form he signed that day indicated, as pertinent:

> Your release is contingent upon your enrollment and successful participation in an Alternatives to Detention (ATD) program as designated by the U.S. Department of Homeland Security. As part of the ATD program, you will be subject to electronic monitoring and may be subject to a curfew. Failure to comply with the requirements of the ATD program will result in a redetermination of your release conditions or your arrest and detention.

(Doc. 13 at 8.)

Petitioner, his wife and child appeared in person at the San Francisco ICE office as instructed on April 21, 2022. (Doc. 13 at 11.) At that appointment, "the family unit" was "placed on ATD SMARTLINK technology, a monitoring application for his personal cell phone." (*Id*.; Doc. 1 ¶ 8.) The program required J.S.H.M. to take a photo every week, answer phone calls from ISAP officers, and report periodically in-person at the Intensive Supervision Appearance Program (ISAP) and ICE offices. (Doc. 1, ¶ 8.) Petitioner was also served with a Notice to Appear (NTA) in the mail indicating he was "[i]n removal proceedings under section 240 of the Immigration and Nationality Act." (Doc. 13 at 14.)

J.S.H.M. admits that "on one occasion" he "submitted his weekly photo check-in one day after the deadline, because of his work schedule," but "[h]e communicated the reason for the delay to his ISAP officer." (Doc. 1 ¶ 9.) He also admits to submitting his photo "a few minutes late on a few occasions because he was driving and could not stop safely and immediately." (*Id*.) He indicates that he communicated the reason for those delays to his ISAP officer and never received any formal warnings, threats of arrest, or formal notice of non-compliance from ISAP officials regarding those "sporadic incidents." (*Id*.)

Respondents describe Petitioner's compliance differently:

> Petitioner continually missed ISAP check-in appointments, missing appointments on no less than 34 separate occasions, including on May 19, 2022; June 2, 2022; July 7, 2022; August 18, 2022; September 8, 2022; September 15, 2022; November 3, 2022; November 10, 2022; December 22, 2022; December 29, 2022; January 5, 2023; June 29, 2023; July 13, 2023; September 4, 2023; September 18, 2023; September 25, 2023; October 2, 2023; November 20, 2023; December 4, 2023; December 18, 2023; December 25, 2023; January 1, 2024; March 7, 2024; April 1,

2024; April 22, 2024; May 6, 2024; July 1, 2024; July 15, 2024; July 22, 2024; August 12, 2024; August 26, 2024; September 9, 2024; October 17, 2024; and September 15, 2025.

(Doc. 10 at 2; Doc. 10-1, ¶ 10-13; Doc. 13 at 18.) According to Respondents, ICE's Enforcement and Removal Operations (ERO) increased the level of supervision applicable to Petitioner two times because of his violations. (Doc. 10-1, ¶ 10.)

Since entering the United States, J.S.H.M. has established a life in Oakland, California, where he has been working as a driver. (Doc. 1, ¶ 10.) He obtained an employment authorization document and holds a current California's driver's license. (Doc. 1, ¶ 11.) He is now also engaged to a U.S. citizen[2]. (*Id*.) They obtained a marriage license shortly before his detention; their wedding is scheduled for November 4, 2025, at San Francisco City Hall and they have a honeymoon planned for Palm Springs shortly thereafter. (*Id*.) J.S.H.M. also timely filed for asylum and withholding of removal, with his final, individual hearing scheduled for 2027 in San Francisco. (Doc. 1, ¶ 11.) "He is deeply interested in pursuing his asylum petition because he was the victim of a murder attempt in Colombia." (*Id*.) It is undisputed that Petitioner has no criminal history. (Doc. 13 at 21.)

On September 22, 2025, pursuant to instructions from ICE, J.S.H.M. presented himself for a scheduled check-in at the San Francisco ICE Field Office. (Doc. 1, ¶ 12.) Eventually, J.S.H.M. was informed that he was under arrest. (*Id*., ¶ 14.) According to Petitioner, when he asked for a reason, "the officers were vague, stating only that it was 'their work' and that there were unspecified 'problems with [his] reporting.'" (*Id*.) Petitioner alleges that ICE refused to give him additional details. (*Id*.) According to the Form I-831 prepared by ICE that day, an ICE agent informed Petitioner that he was not fully compliant with the ATD case program and that he was being taken into custody due to "violation of his OREC conditions." (Doc. 13 at 21.)

He was held in a small room at the San Francisco office for the remainder of the day and

---

[2] As noted, at his initial entry into the country and when he reported on his Notice to Appear, he, his Columbian wife and child presented themselves to DHS officials. Nevertheless, during a 9/22/25 interview, J.S.H.M. told ICE officers that "he is no longer a part of the family he entered with. He stated he is not married to her, and the child is not his." (Doc. 13 at 21.) As of April 10, 2023, J.S.H.M. was still receiving mail at the same address identified by "the family unit" on April 21, 2022 (*Id*. at 14), though when he was arrested in September 2025, he provided a different address for himself and a different address for the "Columbian wife" and child. *Id*. at 20.

1    overnight. (Doc. 1, ¶ 15.) The next day, he was transported, fully shackled, in a van to Fresno,

2    California. (*Id.* at ¶ 19.) He describes the conditions in the van as "harsh, with limited oxygen,

3    extreme heat, and no room to move, causing J.S.H.M. to suffer from pain from the shackles."

4    (*Id.*) He was held in Fresno in a holding cell for approximately five hours with limited food. (*Id.*

5    at ¶ 20.) He was then transported in a van to Mesa Verde Detention Center in Bakersfield,

6    California. (*Id.*)

7         Since being detained, J.S.H.M. alleges that he has suffered various harms, including sleep

8    deprivation, hygiene issues, and food deprivation. (Doc. 1, ¶ 24.) Detention has caused him

9    "severe emotional distress, and he reports crying frequently." (*Id.*) In addition, J.S.H.M. suffers

10   from chronic rhinitis and allergies, which cause him difficulty breathing. (*Id.*) He was under a

11   doctor's care for this condition before his detention and he claims the conditions of confinement

12   at Mesa Verde are exacerbating these medical issues. (*Id.*) Additionally, J.S.H.M. is unable to

13   spend time with his fiancée, family, and community; is unable to prepare for his wedding; and his

14   fiancée is struggling financially and emotionally. (*Id.*) J.S.H.M's fiancé has submitted a letter

15   describing their relationship, his work ethic, their future plans, and how his detention is impacting

16   her life and the lives of others. (Doc. 1-3 at 2–6.) Numerous other individuals have submitted

17   detailed, articulate letters of support describing Petitioner's good character and positive impact on

18   his community. (*Id.* at 7–24.)

19        On October 4, 2025, J.S.H.M. filed a petition for a writ of habeas corpus pursuant to 28

20   U.S.C. § 2241, alleging that his detention violates both substantive and procedural due process

21   under the Fifth Amendment. (Doc. 1.) He has also filed an ex parte motion for a temporary

22   restraining order that seeks the following relief: (1) immediate release from Respondents'

23   custody; (2) an injunction barring Respondents from re-detaining Petitioner unless they

24   demonstrate at a pre-deprivation hearing, by clear and convincing evidence, that Petitioner is a

25   flight risk or danger to the community; (3) an order prohibiting the government from "sending

26   him to any place outside of the United States." (Doc. 2 at 30.)

27        On October 6, 2025, the Court issued a Minute Order expressing preliminarily that it

28   appears that Petitioner was likely to be able to demonstrate that his circumstances warrant an

1  order requiring DHS to provide him with a bond hearing. (*See* Doc. 7.) The Court ordered

2  Respondents to show cause in writing why the Court should not grant Petitioner's motion for a

3  temporary restraining order and scheduled the matter for a hearing. (*Id.*) The Court also ordered

4  the government not to remove Petitioner from the country or out of the Eastern District of

5  California in the meantime without the permission of the Court. (*Id.*)

6        On October 9, 2025, Respondents filed their opposition, which argues: (1) Petitioner's

7  TRO should be denied because it improperly seeks the same relief as his habeas petition; (2) it

8  was Petitioner's "abysmal[]" performance on supervision that prompted his re-detention; and (3)

9  Petitioner is mandatorily detained during his removal proceedings pursuant to 8 U.S.C.

10  § 1225(b)(1) and his noncompliance with the terms of his release distinguish this matter from the

11  many cases in which this Court has rejected Respondents interpretation of § 1225. (*See* Doc. 10)

12  Petitioner filed a reply brief on October 14, 2025. (Doc.12)

13        For the reasons set forth below, the Court converts the matter to a motion for preliminary

14  injunction and **GRANTS** the motion in part.

15  **II.    LEGAL BACKGROUND**

16      **A.    Statutory Immigration Framework (8 U.S.C. § 1225 and § 1226)**

17        Two statutes govern the detention and removal of inadmissible noncitizens from the

18  United States: 8 U.S.C. § 1226 and § 1225. In the interest of expedience, the Court relies here, as

19  relevant, on the legal background accurately presented by the district court in *Salcedo Aceros v.*

20  *Kaiser*, No. 25-CV-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025):

21          **A.  Full Removal Proceedings and Discretionary Detention**
22             **(§ 1226)**

23          The "usual removal process" involves an evidentiary hearing before
        an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*,

24          591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C.
        § 1229(a), also known as "full removal," by filing a Notice to

25          Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*,
        25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that

26          while removal proceedings are pending, a noncitizen "may be
        arrested and detained" and that the government "may release the

27          alien on ... conditional parole." § 1226(a)(2); *accord Thuraissigiam*,
        591 U.S. at 108 (during removal proceedings, applicant may either

28          be "detained" or "allowed to reside in this country"). When a
        person is apprehended under § 1226(a), an ICE officer makes the

initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

## B. Expedited Removal and Mandatory Detention (§ 1225)

While "§ 1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

> "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the

responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,' " that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further

hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

## C. The Government's Recent Change in Position

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)). . . .

In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute.*" Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ... whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are

encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025).

Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4 (internal footnotes omitted).

### B.    Parole

ICE may choose to release a person on parole. The decision is discretionary and is made on a case-by-case basis. An immigrant who has been detained at the border may be paroled for humanitarian reasons, or due to it providing a significant public benefit (8 U.S.C. § 1182(d)(5)(A)), or they may be conditionally released (8 U.S.C. § 1226(a)). These are distinct procedures. A person on conditional parole is usually released on their own recognizance subject to certain conditions such as reporting requirements.[3] To be released on conditional parole, there must be a finding that the immigrant does not pose a risk of flight or danger to the community. *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir. 2007).

Of relevance in this case is DHS's "Alternatives to Detention" (ATD) program, designed "to provide supervised release and enhanced monitoring for a subset of foreign nationals subject to removal whom ICE has released into the United States." *Audrey Singer*, Cong. Research Serv., R45804, Immigration: Alternatives to Detention (ATD) Programs 14 (July 8, 2019), https://sgp.fas.org/crs/homesec/R45804.pdf ). "These aliens are not statutorily mandated to be in DHS custody, are not considered threats to public safety or national security, and have been released either on bond, their own recognizance, or parole pending a decision on whether they

---

[3] An immigrant cannot be released on conditional parole if they are subject to mandatory detention under § 1226(c). There is no suggestion that § 1226(c) applies in this case.

1    should be removed from the United States." (*Id.*)

2    **C.    Parole Revocation**

3    In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025), the court

4    explained the parole process in immigration cases and noted that before parole may be revoked,

5    the parolee must be given written notice of the impending revocation, which must include a

6    cogent description of the reasons supporting the revocation decision. The court held:

7    Section 1182 . . . has a subsection titled "Temporary admission of
     nonimmigrants," which allows noncitizens, even those in required
8    detention, to be "paroled" into the United States. This provision, at
     issue in this case, states:

9

10   The Secretary of Homeland Security may, except as
     provided in subparagraph (B) or in section 1184(f) of
11   this title, in his discretion parole into the United States
     temporarily under such conditions as he may prescribe
12   only on a case-by-case basis for urgent humanitarian
     reasons or significant public benefit any alien applying
13   for admission to the United States, but such parole of
     such alien shall not be regarded as an admission of the
14   alien and **when the purposes of such parole shall, in
     the opinion of the Secretary of Homeland Security,
15   have been served the alien shall forthwith return or
     be returned to the custody from which he was
16   paroled and thereafter his case shall continue to be
     dealt with in the same manner as that of any other
17   applicant for admission to the United States.**

18   8 U.S.C. § 1182(d)(5)(A).

19   *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under

20   the Administrative Procedure Act, immigration parolees are entitled to determinations related to

21   their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An

22   agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the

23   agency fails to "articulate[] a satisfactory explanation for its action including a rational

24   connection between the facts found and the choice made." *Id*. Parole revocations in the context of

25   the INA must occur on a case-by-case basis and may occur "when the purposes of such parole

26   shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall

27   forthwith return or be returned to the custody from which he was paroled." *Id*. at *12 (quoting 8

28   C.F.R. § 212.5(e)). 8 C.F.R. § 212.5(e) requires written notice of the termination of parole except

1  where the immigrant has departed or when the specified period of parole has expired.

2       Applying *Y-Z-H-L* and § 212.5(e), *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV,

3  2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), found that the INA requires a case-by-case

4  analysis as to the decision to revoke humanitarian parole:

> This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual [noncitizen] received parole." *See id*. There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination specific to Mata Velasquez that either "the purpose for which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." *See* 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

14  In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3

15  (N.D. Cal. July 24, 2025), the court reached a similar conclusion relying on the Due Process

16  Clause:

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

26  *Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No.

27  2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v.*

28  *U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme

1  Court has consistently held that non-punitive detention violates the Constitution unless it is

2  strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral

3  decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

4  **III.      ANALYSIS**

5          **A.      Jurisdiction**

6                  1.      Habeas Corpus

7          Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of

8  habeas corpus in which the petitioner asserts they are being held in custody "in violation of the

9  Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack

10  by a person in custody upon the legality of that custody, and that the traditional function of the

11  writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

12  Petitioner seeks immediate release from custody, which he contends violates the Constitution of

13  the United States. (*See* Doc. 1.) Thus, he properly invokes the Court's habeas jurisdiction.

14                  2.      Judicial Review Under the INA

15          The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g) precludes

16  this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

17  adjudicate cases, or execute removal orders against any alien," there are no final removal orders

18  at issue here. The Court is also not reviewing the executive's decision to conduct removal

19  proceedings against Petitioner. Thus, the Court has the jurisdiction to review the authority under

20  which Respondents claim to detain Petitioner as well as whether the detention comports with

21  statutory and constitutional requirements. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018)

22  (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in

23  the subsection); *see also Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471,

24  482 (1999).

25          **B.      Injunctive Relief**

26          The standard for issuing a TRO is the same as the standard for issuing a preliminary

27  injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir.

28  2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

1   "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are

2   "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

3   the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

4   "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

5   (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

6   test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

7   1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

8   *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

9   Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

10  at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

11  the issuance of a preliminary injunction where there are "serious questions on the merits … so

12  long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

13  injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy

14  never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended "merely

15  to preserve the relative positions of the parties until a trial on the merits can be held, and to

16  balance the equities as the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct.

17  659, 667 (2025) (citations omitted).

18      The status quo refers to "the last uncontested status which preceded the pending

19  controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

20  *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

21  Court's view, that is the status when Petitioner was re-detained not before he was arrested as

22  urged by Petitioner, because the question is whether his violations, as detailed above, constitute

23  sufficient justification to retain him in custody. *See Kuzmenko v. Phillips,* No. 25-CV-00663,

24  2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025).

25      Even if the Court's action here constitutes a mandatory injunction,[4] the evidence supports

26  
27  
28  

---

[4] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting

1    that action. Petitioner alleges he has suffered and is suffering violations of his substantive and

2    procedural due process rights and that his continued unlawful detention will impose on him and

3    his family serious injury if the injunction does not issue. The injunction issued here is on firm

4    legal footing. As discussed below, due process requires that Petitioner be given post-deprivation

5    process. Because DHS failed to do so and there have been no changed circumstances, a prompt

6    bond hearing is required. These injuries are not capable of redress through monetary

7    compensation. Accordingly, injunctive relief is appropriate even under the higher standard for

8    mandatory injunctions.[5]

9              1.    <u>Likelihood of Success on the Merits</u>

10   This first factor "is the most important" under *Winter*, and "is especially important when a

11   plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

12   Cir. 2023).

13             a.    *Respondents Rely on an Incorrect Interpretation of § 1225 for the*

14                   *Authority to Detain Respondent*

15   One of Respondents' central arguments is that Petitioner is subject to "mandatory

16   detention" pending removal proceedings under 8 U.S.C. § 1225(a)(1), 1225(b)(2)(A). (Doc. 10 at

---

17   *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction

18   is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages,"
     and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

19   [5] The government questions whether the Court can order preliminary relief of the nature requested here because the
     relief sought is akin to the relief requested in the underlying § 2241 petition. (Doc. 10 at 4.) The government cites

20   *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992), which held that entering "judgment on the merits in
     the guise of preliminary relief is a highly inappropriate result." But the circumstances of that case were quite

21   different. In *Mosbacher*, the trial court ordered as preliminary relief the release of data that the defendant sought to
     keep private and thus, had the Ninth Circuit not reversed, the defendant would "have lost the whole case for all

22   practical purposes." *Id*. Some district courts have relied on this line of cases to deny immigration detainee's requests
     for release at the TRO stage. *See, e.g., Mendez v. U.S. Immigr. & Customs Enf't*, No. 23-CV-00829-TLT, 2023 WL

23   2604585, at *3 (N.D. Cal. Mar. 15, 2023) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Keo v.
     Warden of Mesa Verde Ice Processing Center*, No. 1:24-cv-00919-HBK, 2024 WL 3970514 (E.D. Cal. Aug. 28,

24   2024) (citing *Mendez, Mosbacher*, and *Comenisch*). But a closer look at *Camenisch* reveals that the Supreme Court
     did not intend to bar TROs of the kind requested here. Rather, *Camenisch* stands for the proposition that "findings of

25   fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not
     bind the court at the trial on the merits. Thus, it is not appropriate to enter a final judgment at a TRO stage." *Doe v.

26   Noem*, 778 F. Supp. 3d 1151, 1167 (W.D. Wash. 2025) (evaluating government argument based on *Comenisch*). *Doe
     v. Bostock*, No. C24-0326JLR-SKV, 2024 WL 2861675 (W.D. Wash. June 6, 2024), cited by the government (Doc.

27   11 at 5), is not persuasive. There, the petitioner was released from a federal correctional facility after serving a
     criminal sentence directly into ICE custody and then challenged her <u>continued</u> detention. *Doe v. Bostock*, No. C24-

28   0326-JLR-SKV, 2024 WL 3291033, at *2 (W.D. Wash. Mar. 29, 2024) (report and recommendation). Under those
     circumstances, the status quo was <u>detention</u>, not release, so the requested form of preliminary relief –immediate
     release—was inappropriate for that reason.

1.) Respondents admit that the legal arguments relied upon by DHS to support this assertion have

been rejected by this Court in other proceedings. (*Id*.) In one such recent case *Ortiz Donis v.*

*Chestnut,* 1:25-CV-01228-JLT, 2025 WL 2879514 at *3–6 (E.D. Cal. Oct. 9, 2025), and others,

Respondents have relied on the BIA's recent decision in *Yajure Hurtado* affirming the

government's new interpretation of § 1225. This Court has reviewed and considered the

government's interpretation adopted by *Yajure Hurtado*. Again, in the interest of expedience, the

Court relies on the analysis set forth in detail in *Salcedo*:

> Ms. Salcedo Aceros argues that § 1225(b)(2) does not apply to noncitizens like her, who have been released by DHS on their own recognizance into the interior of the country. Dkt. No. 17 at 4. A number of district courts that have examined this issue in recent months have so held. These courts have rejected the Government's expansive construction of § 1225(b)(2), which would allow it to detain without a hearing virtually any noncitizen not lawfully admitted. These courts examined the text, structure, agency application, and legislative history of 1225(b)(2) and concluded that it applies only to noncitizens "seeking admission," a category that does not include noncitizens like Ms. Salcedo Aceros, living in the interior of the country. *See Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("[T]he plain text of Sections 1225 and 1226, together with the structure of the larger statutory scheme, indicates that Section 1225(b)(2) does not apply to noncitizens who are arrested on a warrant issued by the Attorney General while residing in the United States."); *Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at *5 (S.D.N.Y. Aug. 13, 2025) (holding 1225(b)(2) "clearly" not applicable to noncitizens who have resided in the country for years); *Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 U.S. Dist. LEXIS 156344, at *29 (D. Ariz. Aug. 11, 2025) (finding that the Government's "selective reading" of 1225(b)(2) "violates the rule against surplusage and negates the plain meaning of the text"); *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025) (rejecting the Government's "novel interpretation" that 1225(b) applies to noncitizens detained while present in the United States); *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1261 (W.D. Wash. 2025) (holding that Section 1226, not 1225(b)(2), governed inadmissible noncitizens residing in the country).

> The Government has not pointed to a single district court that has agreed with its construction of 1225(b)(2). Instead, the Government points to a recent BIA decision agreeing with its interpretation. Dkt. No. 22 (citing *Matter of Jonathan Javier Yajure Hurtado*, 29I & N Dec. 216 (BIA 2025)). There, the BIA held that Section 1225(b)(2) prescribes mandatory detention for all inadmissible noncitizens living in the United States. For the reasons discussed below, the Court finds the conclusion of the district courts more persuasive than the BIA's new ruling.

15

First, the BIA decision is entitled to little deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (observing that while "agencies have no special competence in resolving statutory ambiguities," "[c]ourts do"). Under *Skidmore*, the "weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). In this regard, the BIA's current position is inconsistent with its earlier pronouncements. Prior to its September 5 decision, the BIA issued three non-precedential decisions taking the *opposite* position. *See Martinez*, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025). In one decision, the Board even stated that it was "unaware of any precedent" that would support the Government's position. *Id.* Under *Loper*, the Court has no obligation to defer to the BIA's view, particularly when that view has not "remained consistent over time." *Loper*, 603 U.S. at 386; *see also Skidmore*, 323 U.S. at 140. Moreover, the BIA's reasoning lacks persuasive power for several reasons.

*i.*

As with any question of statutory interpretation, the Court begins with the relevant statutory provisions. § 1225(a) defines an applicant for admission as:

> "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) ..."

§ 1225(b)(2)(A) states:

> "[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."

The Government argues and the BIA agreed that every noncitizen who has not been lawfully admitted to the United States continues to be a noncitizen "seeking admission" and thus subject to § 1225(b)(2). In other words, it treats the phrases "applicant for admission" and "seeking admission" as synonymous.

But this reading would render the phrase "seeking admission" in § 1225(b) superfluous. To qualify for § 1225(b)(2), a noncitizen must (1) be an applicant for admission, (2) be "seeking admission", and (3) be "not clearly and beyond a doubt entitled to be admitted." If, as the Government argues, all applicants for admission are deemed to be "seeking admission" for as long as they remain applicants, then the phrase "seeking admission" would add nothing to the provision. This "violates the rule against surplusage." *Lopez*

*Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at *6 (S.D.N.Y. Aug. 13, 2025); *see also United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("[E]very clause and word of a statute should have meaning."); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[N]o clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Moreover, the Government's and the BIA's reading of "seeking admission" is unnatural and ignores the tense of the term. As one district court observed:

> "[S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there."

*Lopez Benitez*, 2025 WL 2371588, at *7.

*ii.*

Indeed, the Government's and BIA's position conflicts with the implementing regulation for § 1225(b). *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385-86 (2024) (implementing regulations may provide a "useful reference point for understanding a statutory scheme" when issued "contemporaneously"). 8 C.F.R. § 235.3 describes Section 1225(b)(2) as applying to "any *arriving alien* who appears to the inspecting officer to be inadmissible." (Emphasis added.) The regulation thus contemplates that "applicants *seeking admission*" are a subset of applicants "roughly interchangeable" with "arriving aliens." *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025). "Arriving aliens" are specifically defined by regulation as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. This plainly does not describe Ms. Salcedo Aceros. Indeed, the DHS's Notice to Appear form similarly distinguishes between "arriving alien" and "alien present in the United States who has not been admitted or paroled." Dkt. No. 16-2.

☐ You are an arriving alien.
☒ You are an alien present in the United States who has not been admitted or paroled.
☐ You have been admitted to the United States, but are removable for the reasons stated below.

These regulations and forms presume that the term alien "seeking admission" has limited application, not the sweeping construction given to it by the BIA.

17

*iii.*

Another "fundamental canon of statutory construction" is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 588 U.S. 128, 140–41 (2019). Here, the Government's interpretation would "nullify" a recent amendment to the immigration statutes. *See Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025). Section 1226 generally establishes a discretionary detention framework, but provides that for certain noncitizens, detention is mandatory. Section 1226(c). In January of *this year*, Congress amended Section 1226 to add an additional category of citizens subject to mandatory detention. Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). This category includes noncitizens who are (1) inadmissible under 1182(6)(A) [present without admission or parole], (6)(C) [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged with one of certain enumerated crimes. *Id.* If the Government's view is correct, however, all noncitizens who are *already* subject to mandatory detention under § 1225(b)(2), whether or not they have been charged with a qualifying crime and thus are subject to § 1226(c). This view would render the Laken Riley Act a meaningless amendment, since it would have prescribed mandatory detention for noncitizens already subject to it. But "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). If Congress amended Section 1226 to create mandatory detention for certain inadmissible noncitizens, it follows that those noncitizens were not already subject to mandatory detention. Thus, the scope of Section 1225(b)(2) cannot be as broad as the government argues.

iv.

In addressing whether a noncitizen who has lived for years within the United States can be considered "seeking admission," the BIA expressed concern that if a noncitizen is not "admitted" to the United States but is not deemed "seeking admission," then the noncitizen's legal status would present a "legal conundrum." *Id.* at 221. The BIA did not further elaborate, but presumably its concern was that such an individual would have no legal status under the immigration code. This concern is misplaced. The statute explicitly provides a term of art for someone who is not "admitted" but is not *necessarily* "seeking admission": such noncitizens fall into the broader category of "applicants for admission." As noted, otherwise the language in 1225(b)(2), which treats noncitizens "seeking admission" as a subset of "applicants for admission" would be superfluous. All "applicants for admission" have some legal status whether they belong to the subset of those seeking admissions or not.

The BIA also reasoned that petitioner's argument for a narrower construction of Section 1225(b)(2) left unanswered which applicants for admission would be covered by that section if applicants for admission who have lived within the United States for years are excluded from its reach. *Id.* In other words, the BIA believed that an interpretation of § 1225(b)(2) that does not cover all applicants for admission would render § 1225(b)(2) an empty set. Not so. Most obviously, § 1225(b)(2) applies to arriving noncitizens who are inadmissible on grounds other than 8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7) (which are the grounds that put an arriving noncitizen on the track for expedited removal). The statute governing inadmissibility lists ten grounds for inadmissibility, many of which have distinct sub-grounds. *See* 8 U.S.C. § 1182(a)(1)-(10). There are thus arriving noncitizens inadmissible on these other bases who would fall under Section 1225(b)(2), as opposed to Section 1225(b)(1). Section 1225(b)(2) would not be a null set even if narrowly construed.

v.

The BIA acknowledged that the Government's interpretation of § 1225(b)(2) makes it redundant with § 1226(c)'s mandatory detention provisions, and renders superfluous Congress' recent amendment, but nevertheless maintained that this redundant interpretation is not problematic. But as noted above, this conclusion is inconsistent with conventional rules of statutory interpretation. Further, the BIA failed to recognize that interpreting § 1225(b)(2) as district courts have done would not render *any* section of the immigration code superfluous. Under the district courts' interpretation, Section 1225(b)(2) has a role within the statutory framework, applying to arriving aliens inadmissible on grounds other than the two that allow for expedited removal, as noted above.

*vi.*

The BIA's consideration of the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 is also unpersuasive. Prior to 1996, the immigration laws distinguished individuals based on "entry" rather than admission. *Hing Sum v. Holder*, 602 F.3d 1092, 1099 (9th Cir. 2010). Noncitizens who had effected an "entry" into the United States were subject to deportation proceedings, while those who had not made an "entry" were subject to "more summary" exclusion proceedings. *Id.* at 1099–100 (9th Cir. 2010). To remedy this, the IIRIRA substituted "admission for entry" and replaced deportation and exclusion proceedings with a general "removal" proceeding. *Id.* In the BIA's view, this indicates that in enacting IIRIRA Congress sought to create completely level treatment for noncitizens in removal proceedings, regardless of whether they are living in the United States or encountered at the border. It would therefore follow that a provision like § 1225(b)(2) would not differentiate between noncitizens based on their presence in the United States, or the length of that presence.

19

But the BIA erred in its analysis by identifying *one* of Congress' concerns in enacting IIRIRA and then treating it as Congress's sole concern driving the statute. Congress was indeed focused on ensuring that there was "no reward for illegal immigrants or visa overstayers." H.R. REP. 104-469, 12. But Congress addressed this concern: the IIRIRA consolidated exclusion and deportation procedures into a single procedure and provided that noncitizens "who enter illegally or who overstay the period of authorized admission will have a greater burden of proof in removal proceedings and will face tougher standards for most discretionary immigration benefits, such as suspension of removal and work authorization." *Id.*

In making these changes, Congress did not fully disrupt the old system, including the system of detention and release. In fact, according to the legislative record, "Section 236(a) [1226(a)] restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States." H.R. REP. 104-469, 229. Congress' concern about adjusting the law in some respects to reduce inequities in the removal process did not mean Congress intended to entirely up-end the existing detention regime by subjecting *all* inadmissible noncitizens to mandatory detention, a seismic shift in the established policy and practice of allowing discretionary release under Section 1226(a) –the scope of which Congress did not alter. *See Vazquez v. Bostock*, 779 F. Supp. 3d 1239 (W.D. Wash. 2025) (citing H.R. Rep. No. 104-469, pt. 1, at 229).

Accordingly, the Court finds the well-reasoned decisions of the many district courts that have rejected the Government's expansive view of 1225(b)(2) far more persuasive than the new BIA ruling, a ruling at odds with its prior decisions and DHS's actions over the past thirty years.

*Salcedo Aceros*, 2025 WL 2637503 at *8–12. This Court agrees with the reasoning of *Salcedo* and joins the numerous other district courts that have rejected the government's recent interpretation of the relationship between § 1225 and § 1226.

### b.    *Due Process Clause Protections*

J.S.H.M. contends that his continued detention violates his due process rights. (*See* Doc. 1, ¶¶ 103–113.) In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the court held,

. . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his

20

1  |  Court joins other courts of this district facing facts similar to the
2  |  present case and finds Petitioner raised serious questions going to
   |  the merits of his claim that due process requires a hearing before an
3  |  IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-
   |  01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz
4  |  Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3
   |  (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as
5  |  people on preparole, parole, and probation status have a liberty
   |  interest, so too does [a noncitizen released from immigration
6  |  detention] have a liberty interest in remaining out of custody on
   |  bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals."). Even assuming Respondents are correct that § 1225(b) is the applicable detention authority for all "applicants for admission," Respondents fail to contend with the liberty interest created by the fact that the Petitioner in this case was released on recognizance in 2022, *prior to the manifestation of this interpretation*.

Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been applied to Petitioner are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL 2084921at *3. In *Mathews*, the Court determined the following:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

As to private interest, during his more than three years on parole, J.S.H.M. obtained permission to work, pursued gainful employment, and built a relationship with his fiancé and many others in his community. Thus, parole allowed him to build a life outside detention, albeit

21

1   under the terms of that parole. J.S.H.M. has a substantial private interest in being out of custody

2   and his detention denies him that liberty interest. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)

3   ("Freedom from imprisonment—from government custody, detention, or other forms of physical

4   restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

5        The Court also finds that there is a significant risk of erroneous deprivation under the

6   present circumstances. This record suggests several reasons why petitioner's detention may not be

7   justified. First, in 2022, in releasing him on parole, DHS necessarily concluded that Petitioner

8   was not a flight risk or danger to the community. *Noori v. LaRose, et al.*, 2025 WL 2800149, at

9   *13 (S.D. Cal. Oct. 1, 2025) ["In general, '[r]elease reflects a determination by the government

10  that the noncitizen is not a danger to the community or a flight risk.'" *Saravia v. Sessions*, 280 F.

11  Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137

12  (9th Cir. 2018)."

13       The change in circumstance may be J.S.H.M.'s ATD infractions. However, Petitioner

14  asserts that though he was subject to frequent remote and in person ATD check ins, he was never

15  formally informed of any violations. (Doc. 1, ¶ 9.) He also asserts that he was in regular

16  communication with his ISAP officer about his late photo submissions and the reasons for them.

17  (*Id*.) Notably, however, the violations detailed in his A File include not only missed biometric

18  check-ins but also one missed in-person meeting. (Doc. 13 at 18) In fact, he missed a biometric

19  check-in just one week before his arrest. *Id.*

20       The Supreme Court has held that "the Constitution requires some kind of a hearing *before*

21  the State deprives a person of liberty or property." *See Zinermon v. Burch*, 494 U.S. 113, 127

22  (1990) (emphasis in original). However, the Court also recognized that there may be situations

23  that urgently require arrest, in which a prompt post-deprivation hearing is appropriate. *Id.* at 128

24  (noting there may be "special case[s]" where a pre-deprivation hearing is impracticable);

25  *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *9 (N.D. Cal. July 17,

26  2025) ("absent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due

27  process, particularly where an individual has been released on bond by an IJ"). The rapidly

28  developing caselaw on this subject gives limited guidance as to where this line should be drawn.

1    Some courts that have addressed detention-related habeas petitions brought by persons released

2    on ATD have required pre-deprivation process, but in somewhat different circumstances. In

3    *E.A.T.-B. v. Wamsley*, No. C25-1192-KKE, 2025 WL 2402130, at *4 (W.D. Wash. Aug. 19,

4    2025), the district court ordered the release of a petitioner arrested by ICE immediately after

5    appearing in immigration court. That court agreed with the petitioner that ICE's post hoc

6    explanation that ATD violations warranted his detention was pretextual, given that ICE first

7    became aware of petitioner's alleged ATD violations a few hours before his immigration hearing,

8    DHS did not raise those violations at the hearing or argue the petitioner should be detained for

9    any reason, and the petitioner was then provided multiple, inconsistent justifications for his arrest.

10    *Id*. In *Arzate v. Andrews*, No. 1:25-CV-00942-KES-SKO (HC), 2025 WL 2230521, at *7 (E.D.

11    Cal. Aug. 4, 2025), converted to preliminary injunction sub nom, 2025 WL 2411010, at *1 (E.D.

12    Cal. Aug. 20, 2025), the court ordered immediate release of in immigration detainee who had

13    been in compliance with conditions of ATD, even though he had incurred a misdemeanor arrest

14    while on parole, in part because no charges were ever filed.

15        In contrast, this Court ordered a bond hearing in *Martinez Hernandez v. Andrews*, No.

16    1:25-CV-01035 JLT HBK, 2025 WL 2495767 (E.D. Cal. Aug. 28, 2025), where the petitioner's

17    ATD records indicate numerous violations. Though Martinez Hernandez offered explanations for

18    the violations and there was a dispute of fact as to whether the violations occurred, ICE's reliance

19    upon those violations was "not obviously pretextual." *Id*. at * 12 ("If Respondent's view of the

20    facts is correct, it is at least arguable that providing Petitioner with notice and a pre-deprivation

21    hearing would have been impracticable and/or would have motivated his flight."). As this Court

22    noted in *Martinez Hernandez*:

23            In similar circumstances, courts have refused to release the
petitioners but have ordered timely bond hearings. *Carballo v.*

24            *Andrews*, No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464,
at *8 (E.D. Cal. Aug. 15, 2025), citing *Perera v. Jennings*, et. al,

25            No. 21-CV-04136-BLF, 2021 WL 2400981, at *5 (N.D. Cal. June
11, 2021); *Pham v. Becerra*, No. 23-CV-01288-CRB, 2023 WL

26            2744397, at *6 (N.D. Cal. Mar. 31, 2023). "[A]llowing a neutral
arbiter to review the facts would significantly reduce the risk of

27            erroneous deprivation." *Guillermo M. R. v. Kaiser*, No. 25-CV-
05436-RFL, 2025 WL 1983677, at *8 (N.D. Cal. July 17, 2025).

28            Thus, the Court concludes that prompt, post-deprivation process is

required here.

*Id.*

Finally, as other courts have done, the Court concludes that the government's interest in detaining J.S.H.M without proper process is slight. In sum, the Court concludes that he has demonstrated a likelihood of success on the merits on his procedural due process claim.

### C.  Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm). The Petitioner has established irreparable harm.

### D.  Balance of the Harms/Public Interest

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, as mentioned, there appears to be no dispute that there is no evidence that Petitioner poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the balance of the equities and public interest weigh in favor of Petitioner.

**E.  Bond**

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

**F.    Burden of Proof**

Petitioner requests that if the Court orders a bond hearing, the government should bear the burden of proof. (*See* Doc. 12 at 19.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a second bond hearing where the government would have the

1  burden to establish by clear and convincing evidence that his continued detention was justified.

2  *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

> Nothing in this record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden shifting would be constitutionally necessary in all, most, or many cases. There is no reason to believe that, as a general proposition, the government will invariably have more evidence than the alien on most issues bearing on alleged lack of future dangerousness or flight risk.

7  *Id*. at 1212.

8      However, *Rodriguez Diaz* "held only that a noncitizen detained under section 1226(a)

9  does not have a right to a second bond hearing when the only changed material condition since

10  their first bond hearing is the duration of their detention." *Pinchi*, 2025 WL 2084921, at *4. It did

11  not address the burden of proof applicable under the present circumstances.

12     *Pinchi* went on to discuss why the calculus changes for an individual who had been

13  paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing provided under section 1226(a) provides constitutionally sufficient process for those noncitizens who have never previously been detained and released by DHS, [Petitioner's] circumstance is different. Her release from ICE custody after her initial apprehension reflected a determination by the government that she was neither a flight risk nor a danger to the community, and [she] has a strong interest in remaining at liberty unless she no longer meets those criteria. The regulations authorizing ICE to release a noncitizen from custody require that the noncitizen "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons" and that the noncitizen is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
>
> Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). [Petitioner] was apprehended by ICE officers when she crossed the border into the United States [ ]. ICE then released her on her own recognizance. As ICE was not authorized to release [her] if she was a danger to the community or a flight risk, the Court must infer from [her] release that ICE determined she was neither. [Her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in

1
2
3
4

> obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

5   *Pinchi*, 2025 WL 2084921, at *4.

6       This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was

7   required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the

8   government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-

9   detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical

10  even for a post-detention custody hearing for the reasons articulated in *Pinchi*–namely that the

11  immigrant's initial release reflected a determination by the government that the noncitizen is not a

12  danger to the community or a flight risk. Since it is the government that initiated re-detention, it

13  follows that the government should be required to bear the burden of providing a justification for

14  the re-detention.

15                    **CONCLUSION AND ORDER**

16      For the foregoing reasons, the Court **ORDERS:**

17      1.      Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a

18  Motion for Preliminary Injunction, and it is **GRANTED in PART**.

19      2.      Petitioner **SHALL** be provided a bond hearing **within 10 days** of service of this

20  order.

21      3.      At any such hearing, the Government **SHALL** bear the burden of establishing, by

22  clear and convincing evidence, that Petitioner poses a danger to the community or a risk of flight,

23  and Petitioner **SHALL** be allowed to have counsel present.

24      4.      Within three days of the bond hearing, Respondent **SHALL** file a status report in

25  this case confirming that the hearing has been provided.

26      5.      The government may file a further brief on the merits of the habeas petition within

27  30 days. Alternatively, as soon as it can within that 30-day period, the government may file a

28  notice that it does not intend to file further briefing. If the government files an additional brief,

27

Petitioner may file a further brief within 30 days thereafter.

IT IS SO ORDERED.

Dated:  __**October 16, 2025**__

UNITED STATES DISTRICT JUDGE